We'll hear argument next this morning in Case 13-271, Oneok v. Learjet. Mr. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. The complaints in this case claim, as the Learjet one says, "'Defendants' conspiracy directly affected prices for natural gas. The mechanism for that conspiracy,' they say, was false reporting to two common indices, GasDaily and InsideFERC. These publications take in jurisdictional and non-jurisdictional sales data and push out sales information for the entire market for both jurisdictional and non-jurisdictional sales alike. That's the fundamental reason why these complaints are field preempted. The NGA, which is found in our blue brief at page 1A, gives States control over three things, over the transportation or sale of non-jurisdictional gas, as well as its production or gathering." Sotomayor, not since the new regulations, but at the time of these transactions, 2000 and 2001. Could FERC have punished these retail sellers for the consumers? They couldn't punish, Justice Sotomayor, retail sellers as true retail sellers. Here these complaints are not directed at retail sellers. They're directed at jurisdictional sellers. All ten of the defendants in this case, as the district court found at Petition Appendix pages 85 to 98a, are jurisdictional sellers. And yes, FERC could regulate them and indeed did regulate them in the code of conduct, not just for their jurisdictional sales. But that code of conduct came after this, these transactions. It did. It came in 2003. All right. So let's start with at the beginning. Could the consumers have come and complained to FERC? Absolutely. The consumers can come and complain to FERC. Retail consumers. Pure retailers, you know, if there's manipulation that is directly affecting, as it is here, both simultaneously the wholesale and retail market, the remedy for States or retailers is to complain to FERC and ask them to regulate. But what can't happen is what happened here, which is the State coming in and through the State causes of action and directly regulating practices that are common to both the retail and wholesale markets. That's the crucial feature of this case. That is the crucial feature. And as I'm a little bit out of date on this, but as I think and understand the briefs, let's take El Paso as an example of a jurisdictional seller. It's a pipeline. It gathers gas from the field, or used to, and then they'd resell it. Both to retail companies, who give it to your house and are regulated by States, and sometimes directly to a company, a manufacturer or a hospital, for example. Is that right so far? Yes. I take it here we are only focusing on the thing I mentioned last, the direct sales. Well, Your Honor, I think that's the way that they are trying to claim their complaints are written. That's actually not how the complaints are written, as I just read. Well, I've looked through the complaints. I've looked through their briefs. I've looked through your briefs. I've tried to figure this out. And the best I can do is say whether they say it accurately or not. That's what they want to talk about. That's what they want to talk about. Okay. Let's talk about what they want to talk about. Now, we have El Paso going in northern Arizona to a manufacturer. And it says, I am going to sell you 1,000 cubic feet of natural gas at $48 a 1,000 cubic feet. You say, oh, my God. That's very high. I'm imagining very high price. I have no choice. I have to take it. But that, to me, is a very unreasonable price. Is there anyone I can complain to? So I may not understand the hypothetical. If it's purely about the hypothetical, it's that the jurisdictional seller in a direct sale sells the gas at a price that is unreasonably high. Exactly. Is there anyone that the buyer can complain to? There is in that circumstance, Your Honor, because in that circumstance, if the reason the rate is high is not a common practice that affects both markets and the gas. The reason that it's high, I'll tell you that it's high, why it's high. It's high because the owner of El Paso has worked out he can make more money that way. That is the only reason. And I want to know if the customer, they used to be able to complain to somebody, but can they complain now? Yes, Your Honor. Who? So they can complain in your hypothetical to the State itself. Why? But not to FERC. Well, if it's retail sales, they can't complain. I'm saying what it is. It was a direct sale of gas gathered by the pipeline, transported from the field, and sold by the pipeline to a manufacturer. Right. So in that circumstance, if they're selling it not for resale, but selling it for their own use, that's a retail sale. Correct. All right. That is their point. They say there is no FERC regulating this. In fact, most places there is no State regulating this. We think the this, i.e., the $48 per MCF, is set as a result of activity that is unlawful under our State antitrust law, and therefore we would like to sue. That's incorrect, Justice Breyer, because the this is different in your hypothetical and in this case. In your hypothetical, it is true retail rate regulation. 1B gives that power directly to the States, and crucial to our theory is the idea that if this is either transportation or production or regulation of the sale of the rate, which Louisiana Power is what says that's what that proviso is, the States undoubtedly can regulate that. Here's the difference. Your point, I take it, is that the this happens to be the reason that the price is higher, is not because the owner of El Paso said, ha, ha, ha, let's make a lot of money, but rather the owner of El Paso, in addition to that, said that the way to make the extra money is to go out and manipulate the journals, the little gas journal, by lying to them, and that happens to be the same way that they would also get wholesale prices higher. And, Justice Breyer, that's precisely the difference. That's what this Court has said time and again. For example, in Northern Natural, it said, look, you know, if the particular means chosen by the State is the crucial thing for preemption analysis, the means that my friends on the other side are seeking to regulate is a common practice to both markets. I got my answer. I won't interrupt you further. Kagan. Let's assume that that's true, Mr. Cotgiel, that they're trying to regulate a means that's a common practice to both markets. Let's assume that because of that, FERC clearly does have authority to regulate in this area. The question is whether FERC's authority should be exclusive or whether it could be concurrent, not field preemption, right? There would still be a kind of rule of the road, even when field preemption runs out, conflict preemption takes over, and it might be that if the State regulation interfered with the goals and objectives of the Federal regulation, the Federal regulation would trump. But I don't really see a reason in this kind of case why you would exclude the State entirely, even if nothing the State was doing was conflicting with Federal regulation or Federal policy. Justice Kagan, you asked a similar question in Kerns, and I think the answer in Kerns is the same as the answer it is here. Indeed, it's stronger here, which is that this is a field in which this Court has said that time and again is field preempted. When FERC acts in this area, it does provide exclusive jurisdiction. It's not exclusive, it's not exclusive. Kagan, what is in this area, is the question. I mean, yes, there is some field preemption, but why should the field preemption carry into a sphere where the practice being regulated is commonly affected, both wholesale sales, which are clearly in the bailiwick of the Federal government, and retail sales, which are just as clearly in the bailiwick of the State? For precisely what this Court said in Mississippi Power, page 374, quote, We have long rejected the sort of case-by-case analysis of the impact of State regulation upon the national interest in power regulation cases. Congress has drawn a bright line between State and Federal authority in the setting of wholesale rates and in the regulation of agreements that affect wholesale rates.  But you agree that FERC does not have the exclusive authority because you have conceded that a Federal antitrust claim would be okay. So FERC is not the sole regulator. There's room for Federal antitrust claims. Justice Ginsburg, we absolutely agree that Federal antitrust actions are available and would have been the remedy for any problems in this case except for the litigation forfeiture by the other side. We don't think that that somehow makes FERC oust FERC from being the exclusive regulator. I think time and again this Court has said there's a big difference between displacement of Federal statutes, which have to do with canons against implied repeal, and the field preemption analysis. Indeed, in Conner v. Plumer, this Court said, with respect to antitrust claims specifically, preemption of Federal State statutes would be the ruling of this Court, but not Federal. Why? Because Federal statutes can be harmonized one to another by Federal courts, but States don't have quite that same experience. Well, suppose the State law, and I think this is true of many States, just mirrors the Federal antitrust law. It's the same. It's the same substantive regulation. We disagree with that for any number of reasons our brief points out, but even if it were the same, I think two things would follow. One is, then there would be no need for these State lawsuits anyway, because you already have a Federal remedy. Kennedy, I'm interested in the hypothetical. Let's assume that someone sues just under State law, the State law is exactly the same as the Sherman Act, and that's Justice Ginsburg's question and I'd be interested in that. And I think that's complementary authority, which, Justice Kennedy, your opinion in Arizona v. United States decried. Once we're in the field, once Congress has said to a Federal agency, as it is here, FERC is regulating the very practice that they are seeking to regulate three different ways, then you can't tolerate States in the area. Why? Because States will have all sorts of – it may be that they're not going to do it. Kennedy, on that point, let me – and this is a point Justice Kagan was getting at, too. Let's assume that you do not prevail on conflict preemption. We say that the field that has been preempted does not include the practices here. Do you have any argument that there is conflict preemption on the facts of this case? We do. There would be something that would be sorted out on remand. And what is it? It is that FERC is regulating in this area specifically and, indeed, is encouraging the practice of index – of index reporting. And if you have States coming in, then they'll play – then natural gas companies will play to the lowest common denominator and won't be able to report. The FERC report goes through any number of examples of how things that look like wash trades, like Paragraphs 55 and 56, practices such as sleeving, may be regulated by the State because they might – Sotomayor, is there anything left of the State's power to regulate prices? If the retail price controls the wholesale price, that's what it sounds like this industry has created, is there anything left to the State's ability? Absolutely. Because retail prices will always influence the wholesale price. Absolutely, Your Honor. Almost everything. So my answer to Justice Breyer was States have the power in 1B to regulate retail rates themselves, rate regulation, and as well, they have the ability to regulate other things in which FERC can't isolate a practice that directly affects jurisdictional rates. So my friend's hypothetical is about wage and hour laws, or as you said, Justice Sotomayor, they could do anything. If a non-jurisdictional, non-jurisdictional sellers can do anything they want in terms of the consumer, and consumers will always pay the cost of that. No, not at all, Your Honor. Because they have no one they can recouple with. No, not at all. If it's a non-jurisdictional seller, Your Honor, States have full power in the area. Here's our test for preemption. It's very simple. It's just two things. It's a who and a what test. The who is, is the State regulating jurisdictional sellers? Here the complaints are. They're directed at ten jurisdictional sellers. Sotomayor, But they're both. They're jurisdictional sellers and they're the non-jurisdictional sellers. You're trying to characterize them as one. But they're, they're both things. The way the Act works is once you're a jurisdictional seller, you continue to be a jurisdictional seller. And that's why FERC is regulating these ten entities with respect to even their retail reporting. That's what the Code of Conduct does. Why? Because that's the way the GAS Act works. You don't take your hat off as a jurisdictional seller down the road if you're engaged in retail sales. And so that's why that language from Mississippi Power I read to you is so important, because that was a case in which the State was regulating retail. They were trying to regulate retail rates. And what this Court said is, no, it doesn't matter, that's, you know, you can characterize it as a hat or not. It doesn't matter. That's a practice that simultaneously and directly affects both rates. Therefore, FERC has exclusive jurisdiction in the area. Now, all these hypotheticals about wage hour laws and so on are solved by the fact that 5A is very limited. It only gives power to FERC over practices that directly affect the rates. The agency is coming before you saying this is a legitimate interpretation of our authority. Indeed, it's the way they've interpreted their authority over time, and that's entitled to the highest form of deference, Chevron deference. Kagan, suppose the following hypothetical. Suppose there is a company and it has ten customers, and five of the customers are wholesalers and five of the customers are retailers. So it is a jurisdictional seller. And it says to the retailers, we're going to charge you whatever we charge to the wholesalers plus 20 percent. That's what it says to the retailers. And then it lies to the retailers about the price that it's charged the wholesalers. All right? Do the States have power to regulate that, that fraudulent communication to the retailers about what they're charging the wholesalers? I think if the State is — if it's truly about the rate, Louisiana Power says that they can regulate true rate regulation. What they can't do is regulate practices that directly affect the rates. So FERC may have something to say, and indeed I expect would have something to say about that. And 5A says the remedy in a circumstance of divided authority in which — or, excuse me, divided in which both markets are affected, the remedy is, the first line of 5A says States should complain to FERC. Here you've got Federal antitrust remedies. Kagan. So just to make sure I understand, you're essentially saying my hypothetical is like this case and the States would be divested of authority because even though the company is having this direct interaction with the retailers because it's pedged to wholesale rates. Your Honor, I may not understand it, but if it's one indivisible practice as it is here, a common practice of index manipulation, that is something only FERC would have authority over, not the States, if I could reserve. Thank you, counsel. Mr. Yang. Mr. Chief Justice, and may it please the Court. This case concerns FERC's jurisdiction to regulate a practice of a jurisdictional seller that directly affects the wholesale price for natural gas. Now, Justice Kagan, your example, I think there might have been some confusion in the interchange. Your example is a practice that would directly affect the retail rate, not a jurisdictional rate. And in that context, that would lie within the rate-setting authority of the State. But here we have something that's quite different. We have indices for which the indices are based on both jurisdictional and retail trades. Then those indices are used by common practice in the industry and not just by these Petitioners to set wholesale rates and retail rates. That's done in advance, particularly when we're talking about longer-term contracts. The market participants end up often pegging their sale price based on the floating price that is reported in these indices. And where you have both the inputs going into the index, it's wholesale and retail, and the outputs that are both wholesale and retail. And FERC has jurisdiction over the entities. That is, the jurisdictional entities that are actually playing in both fields. FERC, in our view, has authority to regulate under Section 5 and Section 1 the practices of those jurisdictional sellers that directly affect the wholesale rate, that is, the rate over which FERC has exclusive jurisdiction. Kagan, but you're saying, Mr. Yan, that even if the regulation is directed toward a retail transaction, if it directly affects the wholesale rate, you have field preemption over that? Yan, I'm not exactly sure what your hypothetical is getting at. Kagan, the State is regulating a transaction with the retailer. And you are saying because that transaction has these direct effects on the wholesale market and wholesale prices, that that gives you field preemption, that that falls within the category of things which the State is simply not allowed to do, irrespective of whether there's any conflict with Federal law or policy? I don't think I actually agree with that characterization of our position. Okay. So tell me what's the point. So if the State were limited simply to regulating the retail rate, just because a retail rate might have some impact. No, no, no. They're regulating a transaction with the retailer. It's not a price thing. They're regulating a transaction. In the way that they are in this case. I mean, all these false sales, some of them are coming out of wholesale sales and some of them are coming out of retail sales. And the States here are regulating transactions that involve the retailer. Actually, I think we disagree with that premise. I think there may even be further disagreement, but let me just deal with the premise. First, what we're talking about are practices that post-date the transaction. So when we're dealing with false reporting of a sale, that is after the sale has been completed. And that false reporting can be. Well, I thought a lot of these were false sales themselves. Well, there's two things. There's wash trades as well. So with respect to the false reporting, that can be either with a real trade, that they're after the fact reporting it to be something that it wasn't, or. And some of those real trades are real trades with retailers. That's true, but the trade itself is completed. And so the market manipulation deals with future things that might be affected by the index. Now, the index, of course, affects retail rates that use the index just as it affects wholesale rates that use the index. But in our view, where you've got this partial merger, and this is a very unusual aspect of this case, where you have a partial merging of the wholesale and retail rates, the retail markets here, Congress would have intended through Section 5a, which grants FERC authority to regulate practices directly affecting wholesale rates. So it's not just limited to the rates itself and the wholesale sales. But the practice is not. Ginsburg can't give a remedy to the consumers who are involved with the plaintiffs in this case? The answer is no and yes, and it's a little complicated. First, as we noted in our brief, there is a remedy in Federal antitrust law which would be outside of FERC. We also think that there may well be contract-based remedies outside, you know, that would be available. But with respect to FERC regulation, FERC has authority to grant disgorgement, as has been held by the courts under Section 16, and complaints are brought often by States and municipalities and others on behalf of retail customers. The Western energy crisis is an example. There are a number of complaints brought to FERC which FERC adjudicated. They have resulted in settlements. Those settlements with jurisdictional sellers have involved payments to retail parties. There's an open question, and I think it might be very hard outside the settlement context to determine if FERC would have direct authority to order that. But at least in the context of adjudicating disputes brought by States against jurisdictional sellers involving wholesale trades, there can be sometimes a pass-through. That said, we're not relying on the availability of a FERC remedy for retailers here. We think there's an adequate remedy at Federal antitrust, and that's particularly true. Ginsburg. Can you explain can you explain something? The government recommended that we deny cert in this case, and the government's reason was the case lacked prospective importance. So what is the situation today with the Energy Policy Act? Well, the reason why it lacks, it lacked in our view, prospective importance is because whatever the question was about FERC's authority before 2005, Congress expanded that authority in the EP Act. Congress granted FERC not only jurisdiction over jurisdictional entities, which is an important limitation to our position here pre-2005, it granted authority over entities, any entities. So going forward, you know, that's a separate question on how far the EP Act of 2005 goes. But with respect to the questions here, we think that that would be controlled by the EPA Act and not by the authority that existed prior to 2005. That said, prior to 2005, our view is FERC did have authority to regulate the jurisdictional sellers with respect to these practices that directly affect wholesale rates over which FERC has exclusive authority. And this Court in, for instance, both Shindowin and recognized this, the Court recognized this as well in Northwest Central, it said that the exclusive authority of FERC extends not just beyond just the sales, but the practices that are affecting the sales. And the Kagan Can I ask Justice Kennedy's question again to you, Mr. Yang, which is if this were a conflict preemption regime, is there a conflict? Yang We haven't analyzed this under a conflict preemption regime. And so it would kind of depend on an analysis of what the State law prohibitions were vis-a-vis the Federal prohibitions.  And if it were a conflict preemption regime, then you would have to at least have the States accept a FERC determination of the lawfulness of these types of practices and then take that as a given in determining whether there's further conflict. Kagan Sure, that seems right, but, I mean, is there anything that FERC has said now about these practices that would suggest a conflict with this State regulation? Yang It's — we have not analyzed it, and it's difficult for us at this point in the litigation where there seems to be flux in the characterization of what the State law claims are, and there's not been adjudication of what the State law requires for us to determine whether there is conflict preemption. It's not a position that — an issue that we feel that we have a dog in the — a fight in. So, that said, you know, the question of field preemption versus conflict preemption — you always, as you noted before, you always have conflict preemption. This Court, however, has repeatedly determined that the Natural Gas Act, in the Natural Gas Act, Congress intended field preemption to apply because Congress wanted to have national uniformity. Kagan Well, it intended field preemption to apply as to wholesalers. It didn't intend field preemption to apply as to retailers. Yang No, actually, I think the Court has recognized in Northwest Central, for instance — and we cite this in our brief — that the regulation over the wholesales extends, that power extends beyond just the wholesales themselves. And in Section 5A, which the Court cited both in Shindouin and then recognized, I think, in Northwest Central, Section 5A extends that power. This is an extension that Congress did not have any analog with respect to the States. It goes beyond the sales itself to practices affecting the sales. And where you have here the effective merging of a State and Federal market, where, in our view, the States could, if they wished to, carve off their own markets for regulation, but they have not done so, but where you have that merging, and both the practices that are going into the index with respect to the manipulation are both related to wholesale and retail matters, and then you are coming out and you are directly affecting wholesale and retail rates, Congress would have expected the field preemption that is a single Federal standard regulated by FERC to govern the practices in that context. It's an unusual— Roberts, how is the State supposed to separate out the jurisdictional and non-jurisdictional regulations? If I might briefly answer. You may. The State could require that all retail sales be based on an index that is exclusively retail-based. So, for instance, FERC did something analogous with respect to unbundled sales of natural gas by pipelines. It required that the contracts be based only on those indices that meet certain FERC standards. The State could do something analogous. Roberts. Thank you. Thank you. Mr. Fisher. Thank you, Mr. Chief Justice, and may it please the Court. This is an antitrust case, and the plaintiff's claims here are very simple. It's that they paid too much in retail transactions for natural gas because the defendants conspired to fix prices. And this is important for two reasons, each of which independently saves the claims from preemption. First, because the State regulation here is retail — is regulation of retail prices, it falls squarely within the Section 1B reservation of power in the Natural Gas Act. And secondly, the claims necessarily fall outside any field FERC could possibly regulate, because, as my opponents have conceded, FERC has no power over antitrust. It falls outside the agency's power under Otter Tail in California v. FPC. Scalia. I'm not sure it could — it may be an exaggeration to say it falls squarely within the exception given to the States. This is not a State regulation of prices. It's State regulation of a practice that affects State prices, retail prices, but also affects wholesale prices. That's a little different. Well, Justice Scalia, let me say two things about that that are very important. First, the statutory word is sales. What Section 1B reserves to the States is the power to regulate retail, quote, sales. And in that regulatory power, this Court has twice spoken directly to what that means, first in the 1947 Panhandle case, and second in the 1997 General Motors v. Tracy case. And in both those cases, the Court made very clear that the State's power to regulate sales goes far beyond setting a price themselves. It's regulating the terms of service, the terms of— Breyer. Well, all that is true, but it might depend on how. That is, the way I'm thinking about this, which is out of date, but perhaps analogous. We have El Paso. It picks up gas in the Permian Basin. It ships it up to Ohio. It sells it to a retail distributor in Toledo. Classical. FERC regulates the sale for resale. And the local regulator regulates the price to the distributor. Now, there is what used to be a further bizarre and unusual occurrence, which is now common. On the way, El Paso sells directly to a manufacturer. And that seems to be at the heart of your case. Right. Right. So now, I'm thinking we're back to cost of service ratemaking. Suppose, under cost of service ratemaking, you had FERC, which said El Paso is charging too much money for sales for resales because it doesn't do its depreciation properly. Okay. You better lower them. Now, suppose a State, via antitrust or any other way, said the reason that the sales that are direct to the manufacturer are unlawful under State law is because it doesn't do its depreciation properly. And suppose that the depreciation the State is talking about is identical to the depreciation that FERC is talking about. I would say absolute preemption. And if I'm right about that, in this case, we don't have depreciation rules, but we have price setting by consulting Joe's Gas Journal. And here, what the State is saying is the consultation with Joe's Gas Journal that the State wishes to make unlawful is identical to the consultation with Joe's Gas Journal that FERC wants to make unlawful and upon which rests FERC's wholesale price determination, okay, just like the depreciation. And if the one is field preempted, so is the other. Now, that's the analogy I've been going through in my mind, just waiting to ask you, because I'd be very interested in your response. Fisherman So that's the best version of the other side's argument, but it's not this case. You just described Mississippi Power, Justice Breyer, where the State wanted to second guess what FERC had done. Here, the State has no second guessing. FERC has said this is terrible, what happened, as do the States. And now they're going to do the other. Breyer But that's conflict preemption, not field preemption. Fisherman That's exactly right. And so it's critical that let me explain why we're in conflict preemption. And I turn back to Justice Scalia's question about section 1B. This Court has addressed in the most recent Natural Gas Act case what happens when you have a unitary practice that has effects on both the wholesale and retail market. Entire Part 2B of Northwest Central is about that very problem. I want to read you what the Court said in that case. And this is at footnote 12 where it summarizes the holding of the case. They said, In the present case, it is argued Pardon me? This is on page 517 of Northwest Central. It's footnote 12. In this case, the Court says, In the present case, it is argued that each agency acts within its assigned sphere. And the Court observes, There is no provision in the statute itself to resolve such jurisdictional tensions. And here's the solution. Only by applying conflict preemption analysis can it be assured that both State and Federal regulatory schemes may operate with some degree of harmony. And I would tell you there's no other outcome that could possibly square with the statute. If you look at the statute, and this is in the first page of both the blue brief appendix and the gray brief appendix, Section 1B says, and I'm quoting from the beginning, The provisions of this chapter shall apply, and then it goes on to say, to wholesale transactions and the like. And then towards the end it says, but shall not apply to any other transaction or sale or natural gas. So. Breyer. Yes, yes, but wait. Suppose in our classical system years ago that El Paso Gas gets a price set for resale at FERC equal to $3 a thousand cubic feet, and then the Ohio regulator, in regulating the price of the distribution company, forces it down for the reason that it thinks that $3 for the wholesale part is too high. Not close. They couldn't do that. That's right. So it depends on their reason for thinking that the price or the sale, they can't regulate the sale any way they want. They can't regulate it in a way that would interfere with and probably is or is field preempted by FERC's authority to set wholesale rates. Those are two very different points, Justice Breyer. We wholeheartedly agree the State could not regulate retail sales in a way that conflicted with FERC's authority. But we disagree, and this is the holding of Northwest Central, and it's the only reading of the Act that gives meaning to the provision that says that States maintain authority, and it says no provision of this chapter, which would have to include Section 5A, can apply to retail transactions. And so the only way to harmonize those is to give meaning to both and to apply conflict preemption. That's the square holding of Northwest Central. And in Mississippi Power, I just want to stress this, in Mississippi Power, the problem was the State was the whole point of the, quote, prudency review in that case was to second-guess the power allocation that FERC had made. So as the Court itself said, that conflicted with FERC's authority. So once you understand that, the only way to understand that is to say that FERC just had no authority over these transactions. Kagan, I understand your argument, Mr. Fisher, you are rejecting the Ninth Circuit's analysis, because the Ninth Circuit, it's a little bit confusing, but I read the Ninth Circuit's analysis, and proceeding from the premise that my friends are proceeding today, which is Section 5A is coterminous with field preemption, the Ninth Circuit, I think, held what you say it held, which is probably why the Solicitor General was concerned with that case. It holds that FERC doesn't have power. We don't have to fight FERC's power here. If Section 5A gives the FERC power over this practice because it affects wholesale rates, so be it. But what Northwest Central says and what the statute says is that you can't oust the States. So all you're left with is that you can't oust the States. Breyer, let me think of it better. The State, it faces a $3 cost of goods sold to the wholesale pipeline, to El Paso, plus an additional claimed dollar in expenses, including reasonable profit. They are asked for $4 in your house. The State says no. We're not going to give you $4, and the reason is that the $3 is too high. Now, you say that conflicts with FERC. No, it doesn't. FERC made a mistake. They will be delighted when they see that we've gone into the depreciation rules more thoroughly than their own rules, and they should have said $2.50 instead of $3, and when they read our opinion, they're going to jump for joy. To prevent that, we have field preemption, not conflict preemption. Fisherman, no, Justice Breyer, we're not second-guessing anything. We're not even asking to second-guess anything FERC has ever held. First of all, FERC didn't even have regulatory power over these practices at the time they occurred. Now, my friends have described themselves as jurisdictional sellers, but what the statute says is you're a jurisdictional seller or not depending on what kind of sales you're, quote, engaged in. So when you're selling jurisdictional, you are a jurisdictional seller. But when you're making retail sales, you're a retail seller. And we're not asking to second-guess anything FERC has said. FERC, to the contrary, came in with its 2003 Code of Conduct and said, absolutely not, you cannot do these kinds of false reporting and wash sales. So all you're left with, once you understand that it's conflict preemption, and if I could turn back to Justice Scalia's question, is whether you fall under the Section 1B reservation of power. And I've explained to you that Panhandle and General Motors v. Tracy clearly show that we do. The only thing that our opponents cite in response, which is a brand-new argument, never made in the district court, never made in the Ninth Circuit, never even made in their cert papers, is they cite Louisiana Power for the supposed proposition that all States have is regulatory ability over rate setting. But that's not the holding of Louisiana Power. Sotomayor You go back to one point. I'm sorry to interrupt you, but the indices at question, they report both retail prices and wholesale prices? Fisher Theoretically, yes. Of course, in this case, Justice Sotomayor, also completely false transactions. Sotomayor No, no, no, I know that, but so the so El Paso, El Paso Company was reporting fake consumer prices. This is your allegation, I know that. Fake consumer prices and fake wholesale prices. Fisher Well, the reality is they were simply reporting fake prices. I don't think it says whether or not they were supposed to wholesale transactions or supposed to retail transactions. But the important point is how they're used on the other side. Sotomayor I'm not sure how the indices, the indices set both prices, is that what you're saying? Fisher Well, the indices don't set any prices.  Sotomayor No, no, no, the industry sets. Fisher That's right. Sotomayor The same price for both? Fisher That's right. And certainly the industry commonly uses the indices to set retail prices. They also voluntarily, wholly voluntarily, at least sometimes, use the indices at the time of question here to set wholesale prices. Sotomayor Are they the same, those two prices? Fisher No, not necessarily, because you use the index price as a peg, but then you can add and subtract to that, depending on what kind of sale and volume and the like. But even the act of using it as a peg, Justice Sotomayor, is an important insight because it is wholly voluntary that they even use it for wholesale transactions. And so if they're right, that as soon as a given practice affects wholesale rates, and it's their completely voluntary decision to make that so, you'd be giving them a get-out-of-jail-free card if you turn Section 5A into a field preemption statute, because whatever practice they're engaged in with retail sales, all they have to do is do it a couple times in a wholesale transaction, and they'd be out from under State jurisdiction. And my friend tried to explain, oh, you don't have to worry. Roberts You could say the same for setting prices, anything at all. I mean, that's kind of the idea, is that if it affects prices affecting sales, then it is preemptive. The fact that they may engage in certain practices that affect sales is not a bad thing in the abstract. I mean, the case is proceeding on the ground that you're dealing with a practice that is, you know, offensive in both contexts. But State and FERC may have different views on that. So the fact that the jurisdictional sellers engage in a practice that affects wholesale rates is not, shouldn't be regarded as problematic. Fisher No, it shouldn't, if all you're doing is asking whether FERC has authority to regulate it under Section 5A. What we're saying is if you transform Section 5A into a field preemption statute, you'd have the difficulty of giving the defendants themselves or any malfactors themselves in the market complete control over how they write their own contracts. They could even peg their contracts to retail prices directly. Justice Kagan, I think that's what you were getting at. They could see them as taxes. Sotomayor Mr. Fisher, there is a field.  Sotomayor Define the field. How would you define what the field is? Fisher The field is what the Court said in Schneiderwind, which is the field is practices relating to wholesale transactions. So all State regulation that is directed at that field is preempted. Now, as I've explained, it is field preempted if the State cannot bring themselves over under the Section 1B proviso. However, we can bring ourselves under the Section 1B reservation of power, and you end up with a simultaneous regulatory system where conflict preemption is the solution. But if I could turn to the second argument in our case, is that the words directed at are very important, because that's the words the Court used in Schneiderwind, which my opponents say is their best case. All State regulation directed at FERC's field of wholesale transactions is field preempted. For two reasons, our antitrust claims are not directed at FERC's field. First, they are generally applicable State antitrust cases, claims, that is. The Court has never used the Natural Gas Act in all of its history to preempt in a field preemption manner a generally applicable State law. And the reason is simple, because it's not, as the Court put it in Schneiderwind, aimed at the natural gas industry. So FERC protects the Natural Gas Act protects that turf, but it doesn't protect the State, protect companies against generally applicable laws. That's what the Court said in footnote 11 of Schneiderwind, and that has to be right. As the American Antitrust Institute points out in its MECAS brief, what if the way the scheme was perpetrated was simply by bribing the publishers of the indices? Certainly, they wouldn't claim that it would be field preempted, but that would be, or they shouldn't be able to, but that would be the conclusion of their argument. Now, even more so, even if you weren't inclined to accept that all generally  applicable laws are preempted, there are two cases to say so, because the only two cases they cite are Louisiana Power and Arkansas, Louisiana, both of which are conflict preemption cases. But even if you wanted to make a narrower holding, you could simply limit it to antitrust law. And, Justice Kennedy, you asked, I think, about the relationship between our antitrust claims and Federal antitrust law, and it's very important. We've said time and again, and they've never disputed, the substance of our claims is exactly what would be prohibited under the Federal antitrust laws. So under this Court's holdings in Otter Tail in California v. FPC, it falls, and I'll use this Court's own words, in California v. FPC, there is no pervasive regulatory scheme, including the antitrust laws, that has been entrusted to the Commission. So FERC has no power over antitrust violations. It's the exact opposite of Kern's, which they say is their — another one of their best cases. Even Kern's — Kennedy, I'm going to ask you a question, and then I'm going to ask you a question about the case. You don't have to argue it, but just so that I understand it. If this conduct, these transactions, had occurred after the FCC's code of conduct, would the case be substantially different in your view? No. No, it would be the same. And is that because you rely on a conflict preemption theory? That's the proper way to go about this, and nothing in the code of conduct conflicts with anything that we're asking for. And remember, what otter tail in California v. FPC hold is that FERC would lack the power to condone these actions. It's not just that they didn't, it's they would lack the power. So this is why the contrast I wanted to draw with Kern's. In Kern's case, this Court said in a very, very broad field preemption holding, it said that what Congress had done there is give everything to the agency. The agency had full power to decide any locomotive practice that would be regulated. And so, therefore, the States couldn't tread on the field that Congress had given to the agency. Here, Congress hasn't given antitrust regulation to FERC. It's a very odd claim to come in here and say the National Gas Act field preempts a claim that the agency has zero power over. That is the claim they're making today. And not only do they have zero power over it, they have zero power to give any remedy to our to our clients. These, these They have power over the transactions that you're complaining about. The transactions that are the subject of the suit. No, they do not have any power over the retail transactions. And even when, even when the code of conduct was enacted, Justice Scalia, and I want to correct something that was said earlier. FERC said it did not have authority over retail transactions. The gravamen of your complaint is the fiddling with the reporting. Yes. That is the antitrust violation. That conspiracy to report false amounts and to make false sales, there is no doubt that the Natural Gas Act places that within the control of the commission. They, it does have the power to regulate those transactions and to punish violations of those transactions. You're using the word transactions. I just want to be clear. Do you mean the reporting? The reporting. The essence of the conspiracy that you're complaining about in the antitrust case, the actions that you're complaining about in the antitrust case are actions that come within the jurisdiction of the commission. So two things, Justice Scalia. One is, to the extent that is so, that only puts you into conflict preemption. That's the holding of Northwest Central, because the indices, as we're complaining about them, were used exclusively in retail transactions. Actually, Louisiana. It's the same point, but in addition, you just said you agreed that they had field preemption over the setting of wholesale rates, that is, sales for resale. And they're saying that it's the reporting to Joe in his magazine, the false reporting to Joe in his magazine. That is what we use to set the wholesale rate, the reporting of Joe to his magazine. And so what they're suing about is the very single fact that we use to set the wholesale rate, and therefore it falls within our wholesale jurisdiction. That's their argument. And you say, yeah, that's their argument, not yours. It's just not factually accurate, because if we win this case, they can pick up the phone tomorrow and lie to indices all they want. And State antitrust law would not prohibit it. It's only prohibited if it's used as a mean to fix prices, and that's what we're doing, price fixing, not the mere reporting. Thank you, counsel. Mr. McAllister. Mr. Chief Justice, and may it please the Court. The States have two strong and primary interests in this case. First, the States have long been leaders in the development and enforcement of antitrust law. Many of the State antitrust laws predated the Sherman Act, and they certainly predated the Natural Gas Act. Over the past century, State attorneys general have invoked State antitrust laws on a number of occasions to challenge anti-competitive practices in the natural gas industry. The States urge the Court not to adopt an interpretation of the NGA that will foreclose the attorney generals from that traditional State role. The second interest the States have is an interest in maintaining the longstanding historical division of authority between the Federal and the State governments in this area. It's important to understand the history. If you want to talk about the original intent of the NGA, the only reason the Federal government got involved was because there were decisions of this Court that said there was certain territory the States could not reach, in particular, interstate transportation and wholesale transactions. So the States urged the Federal government to fill that gap so that consumers and others wouldn't be taken advantage of by the companies, just as they have been in this case. The Federal government, the Congress adopted 1B, is a very clear and unusual, in some ways, if you will, division of authority provision. And it says quite clearly that the Federal government gets power over transportation and wholesale sales, but the rest of it is reserved to the States, as it always was the States' prerogative. Roberts. No, no, not just the sales, but the practices affecting the States is kind of the key of their argument. Mr. Chief Justice, 5A is being argued here is, in the States' view, is a massive expansion of anything Congress ever intended in the Natural Gas Act. 1B is the division of authority. And if you go back to the Court's earliest Natural Gas Act decisions, the 1940s, the panhandle cases, there's a series of them, even into the early 1960s, you can find numerous quotes where the Court says the subsequent sections, 4, 5, 6, 7, 10, you name it, they help FERC implement the authority we've given, but they are not intended to expand the scope of Section 1B. They are not intended to diminish what's reserved to the States. And that's exactly what the United States and the Defendants here are arguing for. The States have no problem with FERC having authority to address manipulation in the wholesale market. We are absolutely comfortable with that. But what we do have a problem with is saying we can't use more than century-old traditional antitrust laws that are not targeting the natural gas industry to protect consumers and businesses in our States that are paying way too much at retail because of a price-fixing conspiracy. The Defendants go so far as to suggest there may be some uncertainty about what's a competitive market. Well, there's no uncertainty about this one. Under any legal regime, under any economic theory, a price-fixing conspiracy is per se unlawful. And the States are not interfering with FERC here. FERC was never asked to bless the conspiracy.  And we agree fully with my colleague, Mr. Fisher, and the plaintiffs that the analysis should be conflict preemption here, not field preemption. And conflict preemption will more than adequately protect any and all Federal interests at stake. And the cases that have come up prior to this can be certainly explained as conflict preemption. Northwest Central, in some ways the Court's most recent statement on this issue, a Kansas case involving production, I believe gives you the blueprint, if you will, for deciding this case. The argument in Northwest Central was the production requirements Kansas was imposing had an effect on wholesale prices, and they probably did. But the Court said that doesn't mean they're field preempted. The Court said the field of production is reserved to the States. Here, the field of retail sales is reserved to the States. The Court went on to say, well, does the Kansas regulation conflict with Federal goals and purposes, concluded that it did not. We are absolutely comfortable with that sort of analysis here. We are not targeting the States under antitrust laws and would not be necessarily wholesale sales. But what we are particularly interested in is protecting consumers, both large and small, from anti-competitive price-fixing conspiracies. And I would just reiterate that I don't think you can fully appreciate, you can look at, I guess I'd put it this way, you can look at four things, perhaps, in deciding the scope of Section 1B. Certainly, start with the text. And to the States, the text is very clear about the division of authority. But importantly, it's a statute that one may not fully understand without looking at the history that led up to it. The Federal Government was supposed to be the gap filler, acting only where the States couldn't, not taking over everything and pushing the States to the side. Thirdly, the structure of the statute is such that 1B is the provision, says the provisions of this chapter shall apply to these things and shall not apply to these things. So it only makes sense that 4, 5, 6, 7, everything that comes after is not intended to alter the scope of Section 1B. And then again, going back to numerous decisions of this Court, particularly the decisions closer in time to the enactment of the NGA, it's quite clear that that was how the Court originally understood the scope of Section 1B. So the States would respectfully ask that the Court affirm the Ninth Circuit's decision. To Justice Kagan's point, we're not necessarily arguing that FERC shouldn't have authority to reach the practices that affected wholesale rates. That we're fine with. But what we do not think is that the retail sales here are field preempted. They should be subject to conflict preemption principles at most. Unless there are questions. Thank you very much. Mr. Katyal, you have 4 minutes left. Katyal, you have 4 minutes left. My friend says the field is, quote, practices relating to wholesale transactions. We agree. That means the only question is whether 1B, these lawsuits fall within 1B. They don't, and here's why. Imagine these lawsuits went forward, for example, in Wisconsin and Kansas. If they won these lawsuits, the result would be a rate of zero, a full refund. That is not rate regulation. That's something else. If in the other States that don't have full refunds, it would be treble damages. Treble damages is not just in reasonable compensation the way that rate setting is, rate setting is. This Court in Louisiana Power was as clear as day that 1B is limited just to the setting of rates. And indeed, in this case, the complaints themselves illustrate why these aren't sales. After all, their own complaints don't even allege that all of the defendants sold to all of the retailers. Now, my friend says, oh, we're not second-guessing FERC with these lawsuits. No, quite to the contrary. Imagine that liability phase of the trial if it were allowed to proceed. It would be second-guessing everything FERC did. Indeed, it would be, look, just like the FERC proceeding. What were the rates? What was the scheme of manipulation? What was done? What was carried out? What would have those rates been otherwise? FERC has in its code of conduct a very careful and fine-tuned analysis of when index manipulation and wash sales are appropriate, when they're not. Scalia, that's no problem. I mean, they say that's conflict preemption. Exactly. And the difference is, Justice Scalia, that if you allow their conflict preemption argument, you're letting 50 States adopt their own rules with respect to this 50 different lay juries. This is something the Court has never done. The best they can come up with is Louisiana Power. And Louisiana Power, and if you look at the footnote and the text around it, is very clear why there was no preemption in that case. It was because the regulation there was directed at producers, at non-jurisdictional entities. These lawsuits are directed at jurisdictional sellers. That's what the district court found in 15 pages of findings. They aren't contesting that. So this would be the first time this Court has ever adopted a rule that says there is simultaneous jurisdiction and conflict preemption in a circumstance in which you are dealing with jurisdictional sellers. It's never happened. And to do so here, I think, would be a real break from this Court's field preemption precedents. My friend's argument for why you should do it is he says, well, people will be able to pick up the phone and manipulate prices. Absolutely not. The Sherman Antitrust Act would bar every allegation in this complaint if they were proven to be true. FERC regulates in this area and is regulating right now. Ginsburg. The point about juries would apply to the Sherman Act as well. It does, and just as I was saying before, Justice Ginsburg, Connell v. Plumer says it's very different when we're dealing with Federal juries which can harmonize Federal statutes and States. Here, Congress has a comprehensive scheme that puts FERC in charge. This Court has never countenanced a result that says you can have divided authority over jurisdictional sellers. And that's the thing. Kagan. Kagan. I think that goes a lot further than anything we've ever done. I mean, the jurisdictional sellers, as I understand this industry, that there are a lot of companies that sell both to wholesalers and to retailers. And always before, I think we've looked at the transaction and said, where is the transaction? Is the transaction a wholesale transaction or a retail transaction? Not, oh, look, you engaged in one wholesale transaction last year, and that insulates you from everything. Justice Kagan, you don't look at the transaction, you look at the practices. That's the word 5A, and that's what the agency here is saying, is that the practices here, the common and inseparable practice of index manipulation directly affects both markets. And so, absolutely, we agree with you, if there's some other circumstance in which there isn't a direct effect on the wholesale market, that's one the States have authority to do. This Court hasn't dealt with that situation, but absolutely, we'll give you that. But this is a circumstance that I think now my friends on the other side are conceding is within FERC's wheelhouse. FERC is here before you saying, we have exclusive authority in this area, it should be deferred to. Thank you, counsel. The case is submitted.